Case number 23-5038. Carter Page appellant versus James B Comey et al. Mr. Scherr for the appellants, Mr. Kelly for the individual appellees, Mr. Schultz for the government appellees. Mr. Scherr, good morning. Good morning, Your Honor. You've already had a long day. My name is Gene Scherr and I'm pleased to be here representing Dr. Page who is here in the audience with us. Whatever one may think of Dr. Page or the president-elect that he served during the events at issue here, this case is controlled by a bedrock procedural principle, one that's grounded in fairness to all litigants, and that is that on a motion to dismiss, the allegations must be accepted as true along with any reasonable inferences from them. And this court has recently emphasized and re-emphasized that principle in a number of cases including Simon versus Hungary and the Rodriguez case. And when that principle is fairly applied, it's clear that the complaint here adequately alleges that the defendants committed four distinct actionable offenses against Dr. Page, which I'll address in order. The first is his claim against defendants Stroke and Page and anyone who acted with them for unlawfully disclosing FISA-acquired information about him to the media in violation of 50 U.S.C. section 1809a2. Next is his claims against all the individual defendants for unlawfully using and disclosing FISA-acquired information in the renewal applications that they filed with the FIS. On the media theory, can you identify what information you're relying on suggesting is that Stroke or Lisa Page leaked information obtained from the FBI surveillance as opposed to the mere fact of surveillance? Yes, I'm happy to describe that now or later. But just putting a pin in it, go ahead because you were summarizing your theory. Yes, and those are actually in the FISA applications which we now have that have been partially declassified, but I'll get to that in a moment. Third is Dr. Page's Patriot Act claim under section 1806a against the government, which is also based on improper disclosure of FISA-acquired information both to the press and in the renewal applications that were filed with FISC. And finally are his claims against the individual defendants for engaging in unlawful surveillance in violation of section 1809a. So with respect to the the claim against Stroke and Page and anybody else who who acted with them, that cause of action arises from his allegations that they unlawfully disclosed FISA-obtained information to the media, as I said in violation of 1809a-2. And if you look first at his complaint, which is where we have to start to see his allegations, counts 2 through 4 allege generally that all the defendants, among other things, unlawfully disclosed information obtained pursuant to FISA warrants. But if you look back in the complaint in paragraphs 225 and 26, those are incorporated by reference in counts 2 through 4, and they provide ample detail as to Stroke and Page's media leak strategy, which actually became famous in the press. They texted with each other and those texts became public about how they were going to they were going to leak information from the Carter Page investigation, and it turned out that some of that was, we believe there's good reason to believe some of that was from the the information that was that was obtained through their through their earlier FISA applications. So it does say that they leaked existence of the warrants, the contents of the applications, and the results of the warrants. It seems to me that the statute only covers the results of the warrants. That's correct. And is there anything more concrete to substantiate that any of the reporting, any of the people who recorded knew anything about the results? There's there's a little more information about that in paragraph 225, where it says Stroke and Lisa Page collaborated to disclose protected information regarding Dr. Page to the media and sought and obtained approval to do so for Mr. McCabe, and and obviously if those allegations are true and truth has to be assumed at this stage, then they are sufficient to establish a violation of 1809A2 as to the execution of their strategy. Now your next question may be why do we think that's plausible, right? And what it and what is there in in the complaint that makes it more plausible than mere speculation? Well it's important to remember that the complaint incorporates by reference, it mentions and incorporates by reference all of the applications that were filed with FISC, which were declassified in not until February of 2020, okay? And and we provided those to the court in the addendum. And and I would invite you, if you if you would like to, to turn to page 238 of the addendum, which contains some some information that makes the more general allegations of the complaint even more plausible. 238 is from the, let's see, is from the second renewal application, which was submitted to the page 232 of that application, which is page 238 of the addendum. You'll see about about halfway down the page that this application says, although Page publicly and in interviews with the FBI has denied meeting with Sechin and Dyvyekin during his July 2016 trip to Moscow, those were those were well-known Russian operatives, okay? So so there's that there's that discussion about his possible meetings with them. And then notice what comes immediately thereafter in this document. The rest of the the rest of the information is blacked out and it says FISA acquired information subject to sequestration, giving rise to the inference that that that the additional information there which was presented to the FISC, but not available to us yet, was obtained through surveillance under the prior warrants. Right, so you think you're addressing strokes and pages, leaks to the media, what is covered is... That's next. ...acquired information and that information is not, okay. Yes, that is that is that is absolutely next, Your Honor. I do just want to, before I go there, I'd like to point out one additional aspect of this application. If you if you scroll down to page 241 of the of the addendum, there's a another little paragraph about Page's international travel. And the first part of that is once again blocked out as FISA acquired information. And then it says the FBI believes that the RIS, that's the Russian intelligence services, and Page may be meeting face-to-face. And then it goes on and there's other information that's that's that's blacked out. Okay, so what does that have to do with the Washington Post article, which is which is the key event? Well, when you when you combine the timing of this application, which which was filed four days before the Washington Post article came out on April 11th, and then when you compare what we've just seen in that application that's blocked out as being FISA acquired information, but we know something about it. We, you know, you can assume that it has something to do with the Russian intelligence service and those two particular gentlemen that are that are listed there on page 238. And then if you and then if you then go to the post article, which is it's at Joint Appendix 97. Okay, the first page of it is on on the prior page, Joint Appendix 96. No, I'm sorry, 95 is where the article begins. But if you but if you look at page 97, at the top of the page it says the government's application for the for the surveillance order targeting page included a lengthy declaration that laid out investigators basis for believing the page was an agent of the Russian government. Of course, the FBI later admitted that that was just false. Okay, and the FISC scored them for it. But the lengthy declaration that was part of the basis for the for this application that page was an agent of the Russian government and knowingly engaged in clandestine intelligence activities on behalf of Moscow, official said again at the FBI later admitted that was just false. And then here's the key paragraph, which is the next paragraph. Among other things, the application cited contacts that he had with Russian intelligence operatives in New York City in 2013 and officials said those contacts that are earlier surfaced in a federal espionage case brought by the Justice Department against the intelligence operative and two other Russian agents. And then here's the key sentence. In addition, the application said page had other contacts with Russian operatives that have not been publicly disclosed. Leading again to the to the inference that what the reporter was talking about there and the information that she had gotten from Stroke and or page was information about additional contacts with Russian operatives, which when you look at the application is pretty clear that information is coming from prior FISA surveillance under the prior warrants. So you know, based on all of that, certainly the allegation is plausible. Why is it not? Why is this this notation in addendum to 38 referencing the federal espionage case brought by the Justice Department previously? Why is it referencing it? Why is it not referencing that? Why do you connect the media's reference here to prior surveillance page as opposed to other prior? Well, because when you, it's an inference, Your Honor. It's not, you know, we're not dealing in certainty here. All of this information is classified. That's what makes this case so difficult. But so drawing inferences as we must, if we go back in time a little earlier, if you look at the very first application that was filed for surveillance of Carter Page, there were no redactions of this kind, okay? No redactions that said FISA acquired information subject to sequestration, okay? The second application, which was the first renewal application, had 16 instances of redactions like this, okay? Suggesting that there were 16 bits of information that had been acquired in the first round of surveillance that were then presented to the FISC as a basis for continuing to investigate and continue to surveil him. And then in the second renewal application, which is the one we're looking at right here, if you count them up, there are a total of 22 references to FISA acquired information. Suggesting again the, you know, the FBI was continuing to get more and more information as a result of this surveillance of Dr. Page, and the thing was kind of building on itself and snowballed. I take it in your theory it doesn't matter whether the information that's disclosed is punitively supportive of probable cause or not, because the application just requires updating on what was found, even if it's completely inaccurate. Right. It's still the disclosure of information obtained through a FISA test. Yeah, and so for purposes of this claim against Stroke and Page, the key fact is that they took this information that had been acquired as a result of their prior surveillance, and they passed some of it on to the post reporter who wrote about those Russian contacts that had not been previously publicly disclosed. Again, we're not absolutely certain, but that's a fair inference from the allegations of the complaint and the warrants that are incorporated by reference in the complaint. Let's address how you get past statute of limitations issues. Yeah. You know, just with respect to having information through the Washington Post article April 2017, in which Page actually makes statements. Yeah. So, you know, therefore having some knowledge with respect to discovery rule, then you're responding also to the House committee, and then you've also got the November proceeding. Right. All occurring in 2017, and so the discovery rule essentially is indicating that, you know, what do you know when, and then do you have diligent efforts to find out more that leads you there. And, of course, the district court found essentially that, yes, there was knowledge acquired at a certain point in time, but seemed to have gone to a somewhat of a heightened standard of discovery, as if there was something more, although not based in our case law, you know, requiring that. Well, I think it's important to remember that there are multiple different claims floating around here, right. One potential claim by Dr. Page would be against the FBI for the original surveillance, and certainly, you know, the Washington Post article gave him notice that he was injured from the original surveillance, but what's central to this particular legal theory against Stroke and Page is that it doesn't rely on the original surveillance. What it relies upon is their providing FISA-acquired information to the press in April of 2017, information that they had probably just barely acquired, and or they had just barely listed that in their second renewal application to the fifth, in any There was no way, if you look at the historical record, there was no way that Dr. Page could have known about this kind of misuse of FISA-acquired information until the Horowitz report, because the Horowitz report, through its redactions, in the public version, it made pretty clear that there had been some fruits of FISA surveillance that had been used. So that was, you know, that was in December of 2019, and then the next key event was the declassification of the redacted versions of these warrant applications. They kind of came out seriatim during February of 2020, and so what I just showed you earlier could not have been known to Dr. Page until February of 2020. And then, of course, it was later that the FISC itself revealed that the Justice Department, the FBI, had admitted that the whole thing was fraudulent from the beginning. I mean, they admitted that the third and fourth applications were not, did not adequately provide probable cause, but logically, you know, that took the legs out of the whole enterprise. So... Explain your view of why only three and four, and why that takes the legs out. They don't say that one and two are... Again, if you look at the development of these warrant applications, if the third application, which was the second renewal application, that application had a lot more information in it than, you know, than the prior applications. So, if that third application, the second renewal application, did not provide probable cause to surveil Carter Page, then a fortiori, the earlier ones could not. At least that's a fair inference, because it wasn't as though the prior applications had more information than the later ones, because what was going on is that the FBI was, you know, the FBI was just periodically admitting additional misdoing, and it was because of their admission with respect to their misdeeds as to the third application that they said, there's no probable cause here. But again, logically, if that's true of the third application, it has to be true of the first and second ones. Judge Boothberg, let's see, he assumed that the same thing applied to the first and second applications as the third and fourth. Yes. That is, that there was no factual or insufficient factual support for probable cause. That's exactly right, and that was in June of 2020 when he said that. He made that very point, that I just tried to make. Given that they're admitting that the third and fourth didn't provide probable cause, that necessarily means that the first and second didn't. In fact, he said, I gave the FBI an opportunity to explain to me why they think the first and second might have provided probable cause, and they didn't. They didn't even make an argument. They never admitted that the first and second didn't provide probable cause. But they did not even attempt to defend those once they had admitted as to the third and fourth. So they didn't differentiate the one and two. That's what Judge Boothberg said. I think they did differentiate. Well, I think they specifically said, we acknowledge that the third and fourth did not provide probable cause for surveillance. And they were silent as to the others. Judge Boothberg. So given the requirements applicable at the pleading stage, the relatively relaxed requirements, this claim was not overly speculative or conclusory as the district court concluded. It was, in fact, more than sufficient to get over the bar of a motion to dismiss, and it was therefore error to dismiss that claim. When we look at Hobson versus Wilson, where there was undecified surveillance of individuals who had read news articles reporting the FBI's unconstitutional pro-intel, pro-operations, and the prosecutors also knew they were FBI targets, we held there that the statute of limitations ran, that the secrecy of the operations didn't tell them because there was some news putting the plaintiffs on notice. Why is that not also true here, where the Washington Post article quotes Dr. Page saying, it confirms all my suspicions about unjustified, politically motivated government surveillance. And in fact, he himself compares it effectively to the co-intel pro-unjustified surveillance. And in his letter to the congressional leaders, he says my FISA warrants filled with a potpourri of falsehoods, fabricated from the outset. And as the defendants say, that is hysteria in the lawsuit, and he was stating it publicly back in 2017. Well, I think this gets back to the earlier discussion with Judge Child about the different kinds of claims that are at play here. Certainly, the other side has a much better statute of limitations argument to the extent that Page is challenging the original surveillance warrant and the surveillance that was conducted pursuant to that warrant. But the Hobson case, and I think the key language, if I can find it, is that the court said the plaintiff must know facts giving notice of the particular cause of action at issue. Okay, so if we were talking here about a claim for unlawful surveillance at the outset under the first warrant, you know, Mr. Page's statements and the Washington Post article and all those sorts of things, they would give the defendants a stronger statute of limitations defense. And again, it is a defense, right? They haven't even completed it yet. They haven't even answered. So we don't even know for sure that they're going to invoke that defense. Maybe they have tactical reasons not to. Probably not. A statute of limitations defense. If they think that it's established in the complaint itself, which it's not. But if we're just talking about the facts, the claim that I'm talking about right now with respect to Stroke and Page is not a claim for challenging the original surveillance under the original warrant or even the surveillance under the second warrant. This claim that we're talking about right now is a claim that challenges their disclosure of FISA provision. A1 is surveillance itself. A2 is the disclosure of the fruits of the surveillance. And that's the claim that we're talking about now. And for reasons that we've discussed, there was no way that Dr. Page could have known that they were actually disclosing the fruits of the FISA acquired, of the FISA surveillance to which he was subject as opposed to other things that were not FISA acquired surveillance. Things like the Steele dossier and a host of other things that people were citing during this period when they were trying to allege a connection between the president-elect for whom he worked and Russia. So I hope that answers the question with regard to the statute of limitations on this particular claim. And obviously you have to look claim by claim. But again, I think the key language in Hobson is the statement that says the plaintiffs must know facts giving notice of the particular cause of action at issue and not just any cause of action. And the particular cause of action is the A2 claim for unlawful disclosure of the fruits of FISA surveillance. And your point, just to close the loop, is that it's the release of the redacted applications that closes the circle? That is what I think would put him on notice, that he had that kind of a claim, yes. I don't even think the Horowitz report quite gets there. The Horowitz report kind of suggested that there was some fruits of the FISA surveillance that was used, but it wasn't until those actual applications were released so that you could see how the FBI was using FISA acquired information to buttress certain allegations against him. I mean, they were trying to smear him, right? But if you go back to, again, May 2017, that's the point at which he's dealing with the House Intelligence Committee, and he's mentioning felonies related to leaking and his identity. Then you go on to November 2017, and he's testifying about information that was collected against him illegally. Right, but he doesn't know everything at the time of filing. Well, again, the claim we're talking about is a claim for unlawful disclosure of the information that's been collected, okay? The stuff that he talked about in 2017, yeah, those might well have given rise to different kinds of claims. I mean, there were a whole series of violations that occurred here, and we're focused on the ones that we needed to limit our appellate issues, and we're focused on the ones that we think are absolutely 100% defensible. But that theory only applies to the disclosure claim with respect to the media leaks, because the disclosure claims with respect to the renewal applications and briefing of other people within the Bureau, those are... That's a separate... If you know there's unlawful surveillance based on, you know, made-up information, you know those things are going. Well, and that's the second cause of action that I wanted to talk about, is that specific unlawful use claim. And again, that... I think of it as sort of a pair. The renewal application requires that you report on what you found, so that's a use, or I guess a disclosure, and then briefing within the Bureau I take also to be a claim that he made, and the personnel involved may be slightly different. Yeah, and they're, you know, they involve different unlawful behavior, right? In the case of the Page and Stroke claim, or legal theory, the unlawful behavior is, you know, is leaking the information to the press without authorization. With respect to the claim about using FISA-acquired information improperly for it and seeking additional warrants, the unlawful behavior is in using that FISA-acquired information to create the illusion that the FBI is entitled to continue surveilling him, even though, as we know from the FBI's subsequent admissions and from Judge Bosberg's pointing out, that they never ultimately tried to defend the first and second applications at all. We know that that surveillance was unlawful as well, because it was not supported by probable cause, and the people who wrote and supervised those applications were taking FISA-derived information, as we saw in the example, and there are a couple of other examples that I'll be happy to show you. They were taking FISA-derived information to create the illusion for the FISC that they actually had probable cause to continue surveilling Dr. Page. I mean, Page himself pleads that they turned up zero. That was, you know, in any way tending to be inculpatory. Well, that's not exactly what he said. He said that they did not turn up evidence that he was an agent of a foreign power, okay, and in the example that we just saw... Isn't that the relevant question? Yeah, yes, it is, but in the example that we just saw, the FISA-acquired information that they used to smear him was not showing that he was an agent of Russia. It was just, it had contacts with certain people, and so he, you know, he did say they never came up with evidence that I was an agent of Russia, and that's true, and that remains true, but they came up with a lot of evidence that they used to smear him as having, you know, excessive contacts with people in Russia and people connected to the government in Russia, and those are two different things. So, again, I don't... If you look at the allegations in the complaint, the complaint, I think, quite clearly, if you parse through the different provisions, quite clearly makes the point that he was challenging the FBI's use of that FISA-acquired information. He says, and if you look again, it counts two through four. The complaint says that, having obtained communications through the earlier FISA warrants, the defendants, quote, used and disclosed those communications to obtain the subsequent ones. In other words, to create the illusion that they had probable cause to keep surveilling him, and then paragraphs 229 and 230 describe all of that in more detail, and it's, and again, I would just invite us to look at a couple of other examples, if I can get my computer to turn on. Well, I can't. He does testify that there was a ton of information that was used against him illegally and collected with respect to evidence in that FISA matter, and so I know you keep distinguishing, we have an initial application, we're using the information collected from the initial application going over into the other ones. I'm just not quite sure that I'm catching that distinction. If he is outwardly and blatantly testifying that, I know they have all this information, it's false, they're using it on a false pretense, they're identifying me specifically, they've also leaked it at these points in time in 2017, then what else does he need to go forward with his complaint other than amend as you acquire more information? And your honor, I don't want to be argumentative, but just if I could contest the premise a little bit. I don't think any of those statements, any of those earlier statements that you mentioned, actually said they have unlawfully used the fruits of their FISA surveillance against me. There was a lot of information that they used improperly, beginning with the Steele dossier, which was not FISA-acquired information. It was completely independent of FISA. And if you look at his statements, I think a fair reading of those is that those were the sorts of things he was talking about. I really don't think you could have, again, to use the language of the Hobson case, I don't think there was any way that he could have known of the exact illegality that he later complained of in the two claims that we're making now. I wonder if you would address the claim of engaging in electronic surveillance, the claim that the district court held applies only to the people who are so directly involved in the mechanics of the surveillance, and what you think that actually covers. Well, I think the evident error in the district court's analysis of that issue can be illustrated by a simple example. Suppose that you have a police sergeant sitting next to a young corporal, and the department has decided that they're going to tap somebody. The corporal is the guy who has the headphones on and is actually listening to the conversation. The sergeant is sitting next to him, supervising his activities, and by the way, asking him periodically, what did you hear? What did you hear? And under the district court's analysis of engaging in, it's only the corporal that has the headphones on that's actually engaging in surveillance, not the principal, that is the sergeant, who's directing him and overseeing him and getting periodic reports, and that kind of thing. And that is just, that is an unrealistically atextual reading of that term, engaging him. It's not clear where exactly she would draw the line because she wasn't faced with that close of a case, but if there is sort of a category of authorization and then a category of execution, I think she's saying engaging in, just language supports reading it, and in the context of the statute where there's other references to preparation, just supports reading to apply to some more carrying out kind of conduct. Right. Well, with respect to the district court, that's a red herring here because we're not challenging under this particular provision, 1809A1, which deals with engaging in surveillance. We're not challenging, we're not using that to challenge the initial applications. Okay, that's a different claim, that's an A2 claim that we've been discussing just a minute ago, an unlawful use of FISA acquired information. Okay. That doesn't apply to the initial applications, that only applies to the renewal applications. Correct. Okay. Correct. So what are you using the engaging in to get at? Well, again, the A1 claim is a separate claim, and we believe, and the complaint alleges, and we've contended all along, that especially in the acting pursuant to the renewal applications, the FBI and the various individual defendants who were involved in that, they were engaged in unlawful surveillance, not just the use of surveillance, but they were engaged in unlawful surveillance because they knew that there was never a probable cause to surveil Carter Page at all, and the additional surveillance was merely an effort to create a smokescreen to make it appear that they had probable cause to surveil him. That's the reason the engaging in surveillance was unlawful. It wasn't, for that particular claim, it wasn't the preparation of the warrant applications. That's an A2 violation because they used the fruits of the earlier surveillance. What we're talking about now is the A1 violation for actually engaging in surveillance, and again, we believe, and the complaint alleges, that that was unlawful because it was a charade. The whole thing was a charade. They knew from the outset that there was never a basis to surveil Carter Page, and everything they did from then on until they finally came clean, you know, years later, everything they did from then on was just to try to make it look like there was some validity to what they were doing. They were trying to cover their tracks, and that's why the surveillance was unlawful. So what's your theory that the engaging in claim is not time barred? Because that more is what Dr. Page had stated that he thought was going on when he was talking to the Post, when he was interacting with Congress. Certainly, the statute of limitations argument as to the initial surveillance is, the other side has a stronger argument that that's time barred. You know, as you go, you know, as you go forward in time, the statute of limitations argument becomes less strong because there were, you know, there were additional things that happened to put Dr. Page on notice that, yeah, he was really right that this whole thing was a charade from the outset. And you're specifically referring to the Horowitz report and the release of the redacted application? Correct, and the FISC statements in June of 2020 and all those sorts of things. But again, it's important not to confuse those two claims when it comes to the statute of limitations, because the statute of limitations argument as to the engaging in surveillance is very different from the statute of limitations argument as to misuse of the FISA-acquired information. All right, you need to wind it up. Okay, well, let me just conclude by saying that the three provisions on which Dr. Page has based his claims are essential to the ability of ordinary Americans of all political persuasions to hold their government accountable for the kind of malfeasance that's plausibly alleged in Dr. Page's complaint and the district court's proper dismissal should be reversed. Thank you. I'll give you a couple minutes and reply. Thank you. All right, Mr. Kelley. Mr. Kelley? Please record. My name is David Kelley. Before you begin, I just want to get a couple of things clear. First of all, are we allowed to know who actually conducts the surveillance? That is, are they contractors, are they FBI agents, or are they FBI non-agents? I don't know the answer to that, Your Honor. I would only have to speculate on that. All right, and then do we know, are we allowed to know what was actually surveilled? Again, Your Honor, I'm not sure what the fruits of the surveillance actually were. I think we'd have to go outside the record here to determine what that was. What was surveilled? Yes. My phone, his laptop, that's what I'm asking about. Yes, Your Honor. Well, I think it was his phone and his laptop, but I have to confirm that. And is this, I mean, this is just a general question. You know, when we watch the movies, we see someone sitting in a van with the headphones on, as Mr. Sherwood was referencing. Is that, is there still some mechanical thing, or is it like you contact Verizon? Well, there's a variety of different ways, depending on the device, Your Honor. But what's important here is that there are no allegations that any of these defendants were involved in any of that process at all. I guess part of understanding the reasonableness or not of the interpretation is whether there's any there there, if you read it the way our colleague on the district court did. In other words, if we're all we're doing is asking Verizon to give us, you know, to keep track of and give us some information, give the Bureau some information, then the notion that the person who's conducting is going to be responsible is quite a different object of legislative attention than the notion that somebody is going into someone's house and putting a bug somewhere. It's a fair question, and I will, I think I defer to my friend in the government who is going to be taking the podium after me on that, on that. But, and I think it varies with the type of technology, but yes, from my experience in government some time ago, it still is the case where you actually, there are people who are actually involved in listening in one form or another. It's not Verizon who's doing the listening, it's agents of the government, whether they be agents or contractors, there's agents of the government who are actually listening and actually conducting their surveillance here. And what we're talking about in this particular case, and by the way, I'm here to represent the Defendant Appellee James Comey, I'm also here to argue on behalf of each of the individual defendants, but in this particular case there are no allegations that any of them did anything apart from being involved in the process of applying for the surveillance and having nothing to do with the actual surveillance. And with regard to that, it's also important to note that there are very distinct levels of participation in that process, some more than others, but in any event, none approaching anything relating to involving surveillance. Well, let me ask you about, do you have the definitions under 1801 in front of you? I do not, Your Honor, but I know it pretty well. Can you get it? Engage it, well, where did it come from? I'm asking about a clause that nobody has interpreted in the definition of electronic surveillance. And that is? And that clause is, if the contents are fired by intentionally targeting that United States person. And I'm asking you if it's a fair reading to say that more than one person targeted Carter Page. I think it's fair to say that the government collectively targeted Carter Page because of the belief that it was an agent of a foreign government, as that is defined under FISA, and I think that was, you know, fleshed out somewhat in the Horowitz report. The fact that they had a basis to conduct that investigation, the question was whether or not they had sufficient probable cause to get the FISA warrant. Let me ask this, why did defendant Comey not intentionally target Carter Page? Why did McCain not intentionally target, in other words, one of the two of them signed the, or authorized the application, signed the application to get the warrant? So to be clear, to be clear, Your Honor, the certification provided by the director of the FBI doesn't have anything to do with the underlying facts, but certifying the purpose of the application, that it complies with the purposes of FISA for investigating an agent for... It's directing the targeting of Carter Page, or it's approving the targeting of Carter Page. I don't think it's fair to say in this context, or in most contexts, that an individual targeted another individual. This was a collection of information that was gathered by the agency, and then it was authorized for the purposes of carrying out the purpose of FISA, and I don't think that you can say that there was an individual amongst these defendants, or amongst any group of individuals, who targeted this plaintiff. It would be a collective... It depends on how you're reading targeted. I mean, targeted is, it could be seen as a much more, just a, almost a physiological explanation of, you know, it's one thing if you're at a party and you overhear something, you know, you're an agent, and you have a hearing aid, and you pick up things that, you know, someone around a corner might not think you would ordinarily be able to pick up, and so you're using electronic thing, and you hear them, but you weren't intentionally targeted. You picked it up by accident. I mean, that's one way of understanding, as opposed to, like, a bias-related... Here, it seems indisputable that they were intentionally targeting him. Putting the surveillance in place is intentionally targeting this individual. So, I think, I think the answer to your question is found in the background of the Crossfire Hurricane investigation, which first came to the attention of the FBI through a source who, the Australian consulate, who had spoken of somebody involved in the Trump campaign, who identified the fact that there may be connections to the Russian government, and from there, the investigation began as to who that might be. So, I think that, again, I wouldn't say that it's targeting so much as the fruits of a collective investigation within the FBI that result in the identification of potential targets, if you will, of electronic surveillance. And, frankly, from the Horowitz report, the Horowitz report doesn't fault the government for having conducted that and that conclusion, the fault laid within the process that they sought, or which they sought, the electronic surveillance. Well, I looked for a definition of targets, not in 1801, but it is mentioned in the applications, and if you look at every application, it cites to, I think it's 1823 or something, that the application targets whoever is going to be surveilled. But, another question I have for you, and this is why I wish you had the definitions in front of you, is 1801-K, the definition of an aggrieved person, and that says it's not just the person who is the target of an electronic surveillance, but any other person whose communications or activities were subject to electronic surveillance. And, yet, 1810, I believe, limits it just to the targeted missing. An aggrieved person. Your Honor, I don't shy away from the fact that... Let me finish. In 1810, an aggrieved person who has been subjected to an electronic surveillance, that's not just the target. No, it's not. That's, you know, if I'm under surveillance, and I'm talking to my sister, she's subject. Absolutely. Okay, she's an aggrieved person. All right. I also would say, I don't mean to shy away from the word targeting. What I mean to move away from is the fact that there was any one individual targeting somebody, because I think there's negative connotations with that, as opposed to somebody who, because of factual information that was developed, becomes the target of an investigation, or the target of electronic surveillance. Let me ask you about the statute of limitations. You cite Rotella v. Wood for the rule that the approval clock starts to run when the plaintiff discovers the injury, hears the surveillance, not the other elements of the claim. I mean, frankly, this isn't your fault, but I find the different precedents here really hard to sort of synthesize. So that is a rule, and it seems like under that rule, it's possible that the pleading placed the injury back in 2017, the awareness of the injury, the discovery of the injury back in 2017, but then Rotella specifies that claims that involve fraud have a different approval rule. So we're not talking about, what we're talking about, the injury here is not fraud. The injury here is unauthorized surveillance. But, I mean, that's where the Richard v. Molesky case comes in. There wasn't a fraud. There was a false allegation about somebody. I mean, there's fraud in the same sense that here there's false or incomplete or wrongful picture put forward, and the wrongfulness of it was not accessible to the plaintiff at the time. Well, it is interesting here. I think the facts are closer to Hobson, and I think there's also great analogs being drawn from other Title III cases, but what's important here, Judge, is the fact that he basically laid out in his response, his public response to the Washington Post, his whole outline for this complaint. He basically said everything there that was wrong and how he was wrong in that response, and under Hobson... Well, he knew all along that he was not culpable, but to know that is not inconsistent with thinking, well, law enforcement may have a probable cause. It's not. But that's not what he said. But they may have that, and so the question is, why don't we assume that that is the reason why Dr. Page didn't sue earlier? I know this is shameless, unjustified, but what could he have pleaded as of 2017 about the defendant's knowledge of the insufficiency of the information? Because, I mean, if you look at Hobson, this court has found that you don't need to know all the wrongdoers, and you don't need to know all the wrongdoing. And what this plaintiff knew was, and what he said he knew, was that the basis for the wire was the Steele dossier. That has absolutely no basis in fact. So he had a very good grounds there to do exactly what he later pleaded. I doesn't really deviate from what he said back in April of 2017. So that's why we think it's unimportant. And in any event, Your Honor, I do think there's another important point with regard to this, too, is what we say in many of the Title III cases, I had a very much of a similar reaction. Like, you don't learn an awful lot in those cases. But, for instance, in one case that we cite in our brief, the plaintiff sued one person, but it later turned out that the wrongdoer was a private investigator, and she waited for everything to be released, and they said that you could have, even though you thought it was somebody else, you had time to sue. So there was plenty of information that he had here that was available to him that he could have filed and then sought discovery and then got all the information that he needed. Who could he have sued on April 11th of 2017 when the Washington Post? I think he could have sued right at that point, yes, Your Honor. Yes. Who could he have sued? Could he have sued in April of 2017? Who? Oh, who could he have sued? Well, first off, he could have started off with the Department of Justice and the FBI. And then subsequently with the discovery, he could have found out more about who it was. And by the way, he also could have gone ahead and sued the FBI director because under FISA, that's a person who has to authorize their surveillance by statute. Now, the other thing if I'm... Can you respond in terms of the time bar to the separate claims that Mr. Sher really focused on, which were the user-disclosed claims, and he's made the more nuanced argument that the... Dr. Page did not have reason to believe that the information that was obtained through the initial warrant and then the renewals was used in the later ones or disclosed in meetings. Well, put aside for a moment, Your Honor, that I don't think there's a violation here of disclosure that was adequately pleaded. You're referring to the grounds on which the district court dismissed? Yes. Bracketing that, assuming that it has been, it would be great to hear your response to this. I don't think... With regard to the statute of limitations issue on the user-disclosed, I mean, first off, it sounded to me in his argument that he's essentially conceding with regard to the first application, that is, that the discovery rule of April 2017 would have begun the clock running. But with regard to the user-disclosed, I think that he could have also... Those are allegations that, one, he could reasonably have known about because of the fact that there obviously had been a leak to the Washington Post, or one could have assumed as much that the information would have been... had to be disclosed. Reasonable inference because Washington Post is talking about a FISA, and that any allegations with regard to who might have done it or what exactly might have been disclosed could have come later, so after he had the opportunity to conduct discovery. How about the user-disclosed and the... I guess the media one is the... So the use of, in the renewal application, of the prior information... Well, I think first off... That you can see how it's not in the initial application, but in the later one, how there are reductions... Yeah, I think that he's looking, you know, he's moving from, you know, reasonable inferences to complete speculation and conjecture as to whether or not there was valid information used in each application and whether or not that would be an improper use. But I also think it's important to point out that, for example, with regard to the struck-and-page allegations, there simply is no... There's no allegation that's pleaded here with any sufficiency about what... The fact that any FISA information was disclosed or used. And it's also interesting, too, that on one hand they're arguing that there was no probable... There was no fruits of the investigation, but then that they were using that information for more probable cause. It doesn't have to be using it for probable cause. It doesn't have to be an improper use. It just has to be intentionally disclosing or using information obtained by electronic surveillance that wasn't authored. But there's no... Even if it's used in a very anodyne way, you know, the warrant application... The renewal application says, tell us what you found so far. And even if it said, well, we listened to him and we found him coordinating about, you know, dog walking, just if that's all they had found, that that would still be in violation, as I understand it, unless you correct me. Well, I think, Your Honor, if it was FISA information, meaning the contents of electronic communications that were recycled through the affidavits, and frankly, there's no sufficient allegation that that was the case. There's no fact supporting that in the complaint. And he's asking for inferences which really go well beyond a reasonable inference to conjecture. And in any event, he mentions information and belief without stating the basis for that information and belief. So it's not adequately alleged under Rule 8 or any standards that this court has applied in the past. So you're relying exclusively on the grounds that the if you look at paragraphs 142, 229, 230, if I disagreed with you that those were, or disagreed with the district court, that those were inadequately concrete, you don't have a separate argument. No, but I think the most important thing here is that there isn't any information. There's no basis to conclude that there was FISA information that was used and disclosed. There was no... Like, the communications that were intercepted and that were used, and that's FISA information. The statute talks about, and I'm just trying to apply this statute, where it says that a person is culpable, he intentionally discloses their uses, information obtained by electronic surveillance, not authorized under FISA. So it doesn't have to be, you know, improperly amping up the probable cause. It doesn't have to be with any particular invidious motive. So if they obtained from the first warrant completely unadorned information, and if you know that the next application, which we do know from the record in this case, that the next application say, and what has the surveillance to date provided, and you just put in there something that is completely factual information, it's not to the harm of Dr. Comey, it's not to the further support... Dr. Page, Mr. Comey. Pardon? I think you meant to say Dr. Carter. Dr. Page, I'm sorry. Not Mr. Comey, but if it's not to the, you know, smearing him in any way, but if it's just using that information, I guess I'm just asking, isn't that a, they do claim under this provision, and B, adequately alleged? He hasn't adequately alleged that there were specified what the FISA information was that was used going forward. He doesn't need to, because there's a place on the form where you have to say what you found, and it was filled in, and it's been redacted, and I mean... But he's not alleging that, but to go in a different direction, he would just be basically guessing that there was FISA information that was used improperly. It doesn't have to be used improperly. But FISA information used, and I think that's speculative. I don't think that he can really, he hasn't adequately alleged what that was, and who used it. Well, whoever was getting a renewal application was using it. He's alleged that. And whoever was talking about whether... But who is the name that has done that? The defendant. No, but without adequate basis to say on information and belief what the information is, and really who did it, it's really, it's basically speculative as to what his allegations are. The people who were involved in the decisional, Shane, reading and approving a warrant application that had a section in it that said, what have you found from the prior surveillance, and had text in that, anyone who reads that is using that information in going forward. I mean, maybe that's a wooden... But I think... But I'm trying to engage you in helping me. I'm trying to, but I think his allegations are essentially conclusory and not sufficiently specific as to who did what. Do you think even today, any of us know, besides the defendant's name, who actually used or disclosed the information to get the second, third, and fourth warrants? Well, so there's... I look at two groups of information used or disclosed. First is what the plaintiff was talking about, principally, when he was up here a few minutes ago. With regard to Strzok and Page, there's no basis to believe that any FISA information was disclosed. I agree with Judge Pollard. We're talking about rolling over information into subsequent warrants, and I think the question is whether or not that's an improper use, number one. But number two, it wasn't sufficiently alleged as to who disclosed what, and whether or not that information was really FISA information. That's what I think one of the weaknesses in his complaint. But in any event, that was... It doesn't have to be an improper use. Where do you get improper? Forgive me, I misspoke. But that's pretty important. It is important, Your Honor. But if he used information improperly would be to disclose it as opposed to just use it. So when I'm talking about disclosing, that would be an improper use. Well, if you're using it in the course of work. So Mr. Comey, the complaint alleges that he was involved in, he had to sign off on the application. But the certification of that application has nothing to do with the verification of what the facts were. Right. But if one of the sections of the application is labeled information obtained from prior surveillance, then he has used information obtained, and then it's a question of the facts, whether it was proper or improper. I think the certification by the Director of the FBI is an issue separate or apart from what is the factual basis supporting the affidavit. The certification by the Director of the FBI is the purpose to be served by the conduct of the positive surveillance. Can I ask you, if you're reading of 1809A2, discloses or uses, are you saying we don't know who used it or disclosed it, and that's the problem? It's too, it's not concrete enough? Or are you saying disclosed or used means outside? In other words, it cannot be used to prosecute somebody inside the FBI who is continuing to use information that was obtained by unlawful electors. I think the latter. The purpose of the disclosed and used is outside the government and not within the use of, within the application itself. Then how do you ever use this in a case like this where you, let's just, I won't even say a case like this. Hypothetically, you've got an agent who is acting unlawfully by disclosing or using information that he knows is obtained illegally to get further surveillance. Well, I think in this particular instance, I mean, it was ultimately determined that there wasn't sufficient basis for probable cause. So I think that if the, it's hard to answer that question in a vacuum, but I think if there was information that was conjured up or disclosed improperly at some point, it could surface. It's hard to say exactly what that trigger could be, but yes, it could happen as it did happen here where review of what happened, the determination was made that there wasn't sufficient probable cause, and consequently it was determined to be unauthorized surveillance. Well, it was determined to be a violation of 1809A2. It may be. I mean, that's what we're trying to figure out is if what happened violated this, and if what happened didn't violate this, I don't know how you could get to a rogue agent. Well, I don't know that it's any different if you were using it internally with the application either until at some point if the government tried to use that surveillance and these applications and so forth saw the light of day. You, in the, or I don't know if it was you who represented Mr. Komey and the other individual defendants in the district court, but there was, there's two different pieces of information that are relevant to the time bar issue. One is the Washington Post article. Another is the interactions that Dr. Page had with the Congress, and so his awareness of the facts that ultimately are alleged in his complaint is perhaps more sharply stated in his interactions with Congress, and you had or the individual defendants had argued in the district court that the statements of the House members about a potpourri of falsehoods and fabricated from the outset were part of demonstrating Page's points, and you don't refer to those in the appellate brief, and I wonder. Well, I think the interaction with Congress came after the April 17th article, and our point is that the April 2017 article by the Washington Post really was a triggering point for when he should have, under the case law, become aware of the injury, and from that point in time is when the statute of limitations should run. But if you're worried at all about whether he's aware of the knowledge of falsehood, which is part of the key aspect of the claim. The key aspect of the claim is much more sharply stated in saying that these are falsehoods and that they were fabricated as opposed to unjustified. As I said, you can be innocent but still have valid probable cause raised to investigate you. I don't disagree with you, Judge, because more came out of that hearing than came out from the Washington Post article, so I don't disagree with that. Can you wind it up?  So the other thing I want to point out, too, is as we put – I mean, I can address the engaged in part of this, but does anybody have any questions on that? I think that essentially what he's trying to do is have this court legislate where Congress chose not to, and with that in mind, I also would respectfully address the court's attention to our 20HA letter, which I know you've seen and reviewed. Unless you have any other questions, we'll rest on a brief. Thank you. May it please the court. Benjamin Schultz on behalf of the government defendants. As the case reaches this court, the claims against the government defendants really reduces to just one thing. It's an 1806 claim for the alleged use within the FISA renewal applications. That claim can be resolved in the government's favor for any of three reasons. First, because the claim is precluded under the statute of limitations. As we explain in our brief, the relevant question is not when he had actual notice of all of the elements of his claim, just when he had a reasonable opportunity to know that he had a claim. Second, it can be resolved on forfeiture, because the entire theory that he presents on appeal, that use of FISA-obtained information in renewal applications where the other aspects of the renewal applications contain material of falsehoods and omissions, is what constitutes an unlawful purpose, is a theory that was never presented in the district court at all. And so under ordinary principles of forfeiture, that argument can no longer be made here. And then finally, it fails on the merits, because all of the allegations in the complaint are about how the FISA-acquired information didn't tend to bolster the government's case. According to Dr. Page, it just tended to show that he wasn't a foreign agent. So whatever unlawful use was being put in the warrant applications, it was the other information that was creating the material omissions and the misinformation. It wasn't the FISA information. So I'll start with the statute of limitations issue, because here there's a couple of distinctions with the claim against the government versus the claim against the individual defendants, but I want to make sure the court understands. First of all, the relevant date for the government that he submitted a valid claim is in September 2018. So that means that he has to show that even then, even as of September 2018, he didn't have the information that he needed. And frankly, we just don't see how that's possible, because not only does that bring in the Washington Post article, it brings in his own testimony before the committee. It brings in the committee report as well. And from all of that, you can see that there were not just initial application, that there were renewal applications. Those gave him information that there was falsehoods and all of that. And for his theory against the government, it doesn't even matter whether he knows whether it was person A or person B, he just has to know that it was the government, and he knew that. So then really the only thing he's left with is the argument that he's presenting today, that he says, you know, well, maybe we knew that there were falsehoods, but we didn't know that there was FISA-acquired information in the applications. And that's actually precluded by his own admissions in the district court. And so if you go to page 209 of the joint appendix, this is his opposition to the government's motion to dismiss. He acknowledges that what's in the renewal application hasn't been publicly disclosed, but he says that doesn't matter because it's logical and plausible to conclude that because there were four successive warrants issued by the FISC, the applications for the three follow-on warrants included information obtained unlawfully through the preceding warrants. So he's telling you quite clearly that he could at the very least reasonably conclude and infer from the fact that there were renewal applications that those renewal applications would have contained FISA-acquired information. And so at that point, once he knew that there were renewal applications, he should have brought the claim. I'd be happy to address that further. I think that can adequately resolve the case. But just briefly on the waiver. And on the statute of limitations, there's some argument about whether there's a six-month and a two-year, and do they both apply? So basically, these are the same procedures that are used under the Federal Support Claims Act. You first have to submit an administrative claim. It's a two-year period to submit that administrative claim from when the claim accrues. Once you submit the administrative claim, once the government denies the claim and it denied it here, then you have six months from the denial to bring suit. So we're not saying he missed the six-month bar. The bar that's relevant here is the two-year bar. And why isn't Page's claim similar to that of Richards and Richards v. Molesky, where we held that the plaintiff's claims were told until he discovered that not just that he knew from the beginning that he was innocent of the charges that were being alleged against him, but we held that he didn't have to sue until he discovered that the sentence had intentionally relied on... that they had a confidential source? So respectfully, Your Honor, there's a couple responses. The first is that at least after the congressional report was released, if not sooner, he knew that there were misrepresentations. I mean, the report, and you can find this on JA 106, Page 106 of the Joint Appendix, it says material and relevant information was omitted, including from the renewals, and it talks about the Steele dossier. And he's already previously said, before that committee report was released, that he thought the Steele dossier was complete fabrication. So at that point, he surely knew that there were lies. In addition, though, I think the relevant question here is that in the terms of the statute that talks about claim accrual, and this is 18 U.S.C. 2712b, the claim shall accrue on the date upon which the claimant first had a reasonable opportunity to discover the violation. It's not that he has to know every single fact. It's just that he has to have a reasonable opportunity. And given that he himself was saying that he thought that there was falsification and that there were congressional report released that tended to support his theory, and given that he himself is saying that once he knew that there were renewal applications, it was logical and reasonable to conclude that there was going to be FISA-acquired information in those applications, then we think he more than met the standard. And in this regard, Your Honor, we cited the Sprint Communications case in our brief, which is the case from this court, and that talks about claim accrual, and it talked about how when somebody had... there was information that somebody was engaged in a particular kind of malfeasance in 1981 with their pricing practices, and this court said, well, even though you didn't know that that malfeasance was going on with regard to different rates that were being set in 1984 and 1985, you could reasonably infer that the illegal stuff that was going on in 1981 would have continued in 1984 and 1985, and that logical inference is sufficient to accrue your claim. So if a logical inference based on one piece of information was sufficient to show that four years later, you had a claim based on different acts, in that case, we think that would also cover this kind of situation. Can I get the motion to dismiss, Sage? So Sprint Communications was actually an agency review case, but again, I think the only relevance that the motion to dismiss has here is what are the facts that the court has to decide based on. Here, if you look at the facts that are alleged in the complaint and you look at the facts that are incorporated by reference into the complaint, you have everything you need, and here, I think his own admission in the district court is this coup de grace, if you will, because he's saying that that was enough for him to conclude that the renewal application is contained by the required information. And I'd be happy to address the other arguments that we have about... We have your brief. Thank you, Your Honor. Mr. Sharkey, two minutes, but that's it. Unless there are questions. Thank you, Your Honor. Just a couple of points in response. First of all, with respect to the statute of limitations, it is an affirmative defense. The defendants have not answered yet, and the arguments that they've made are a perfectly fine summary judgment argument, but not a proper basis for dismissal based on the statute of limitations. And as to the case law, the case law, it seems to me, overwhelmingly supports Dr. Page's position here, the Richards case that we've discussed earlier, the Rotella case also. And then if we look at the... If we think back to your conversation, Judge Henderson, with counsel about 1801... What was it, 1801A? The issue of the targeting. Well, Mr. Kelly said that no individual and no group was actually targeting Carter Page. Well, if that's true, then the surveillance was entirely unlawful because the statute requires that somebody be targeted. And so they were obviously targeting Mr. Page, and what they did, and especially their use and disclosure of subsequently acquired information is patently unlawful, we think. Now, Mr. Kelly also talked a lot about the uncertainty as to who exactly did what, and to the extent that's an issue, we have John Doe plaintiffs in our case, and so it seems to me that would solve that problem. And just by way of conclusion, as Judge Henderson pointed out, if what is alleged here doesn't constitute a violation of 1809, it's hard to imagine how you would ever hold a rogue FBI agent accountable, and we urge the court to reverse the dismissal. Thank you.
judges: Henderson; Pillard; Childs